IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WAYNE R. AVERILL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 12-599-MN |
| ) | |
| DR. CHRISTINA JONES, RN ROBERT ) | |
| DAVENPORT, DR. DALE RODGERS, DR. ) | |
| DEAN REIGER, CORIZON INC., f/k/a ) | |
| CORRECTIONAL MEDICAL SERVICE, ) | |
| CORRECT CARE SOLUTIONS, LLC, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

Stephen B. Brauerman, Ronald P. Golden, BAYARD P.A., Wilmington, DE– Attorneys for Plaintiff.

Quinn T. Griffith, Chad J. Toms, WHITEFORD TAYLOR & PRESTON LLC, Wilmington, DE– Attorneys for Defendants Jones, Davenport, Rodgers, and Correctional Medical Services, Inc.

Daniel A. Griffith, Timothy Willman, WHITEFORD TAYLOR & PRESTON LLC, Wilmington, DE– Attorneys for Defendants Correct Care Solutions, LLC and Reiger.

January 19, 2022
Wilmington, Delaware

*[signature: Maryellen Noreika]*

**NOREIKA, U.S. DISTRICT JUDGE:**

Before the Court is a motion for summary judgment brought by Defendants Christina Jones, Robert Davenport, Dale Rodgers, Corizon Inc. (formerly known as Correctional Medical Services of Delaware, Inc. ("CMS"), Correct Care Solutions, LLC ("CCS"), and Dean Reiger (collectively "Defendants"). (D.I. 238). For the reasons that follow, the Court GRANTS Defendants' motion.

## I. BACKGROUND[1]

On May 14, 2012, Wayne R. Averill ("Plaintiff"), a former inmate at James T. Vaughn Correction Center ("JTVCC") and Howard R. Young Correctional Institution ("HRYCI"), filed a *pro se* complaint asserting violations of his civil rights pursuant to Section 1983, as well as claims of medical negligence, medical malpractice, and negligence. (D.I. 3). On May 9, 2016, Plaintiff was appointed counsel. (D.I. 139). Almost a year later, Plaintiff sought leave (D.I. 154) to file his Third Amended Complaint ("Complaint"), an action under 42 U.S.C. § 1983 that named eleven Defendants and alleged violations of his Eighth Amendment rights. (D.I. 174). Since filing that Complaint, the parties stipulated to dismiss one defendant (D.I. 192) and the Court entered summary judgment in favor of four others (D.I. 205), leaving the six remaining Defendants whose motion for summary judgment is now before the Court.

The Complaint details events that took place from 2009 to 2013. During this time, Plaintiff was incarcerated at HRYCI until May 27, 2010, when he was transferred to JTVCC. (D.I. 174 ¶¶ 16–31). From the beginning of this period until June 30, 2010, Defendant CMS was contracted to provide healthcare for Delaware's inmates. (*Id.* ¶ 3; D.I. 181 ¶ 3). From July 1, 2010 through

---

[1] This case has been litigated for nearly a decade and has an extensive procedural history. Accordingly, the Court will lay out only what is relevant to the present motion. For a more detailed account of this case's history, *see Averill v. Jones*, No. 12-599-MN, 2019 WL 3804686 (D. Del. Aug. 13, 2019).

the end of the relevant period of the Complaint, Defendant CCS provided healthcare to Delaware inmates. (D.I. 174 ¶¶ 7, 49; D.I. 183 ¶ 7). Defendants Jones, Davenport, and Rodgers were medical professionals employed by or independent contractors of CMS, and are therefore referred to, alongside CMS, as the "CMS Defendants." (D.I. 174 ¶¶ 4–6; D.I. 181 ¶¶ 4–6). Defendant Reiger was a medical professional employed by CCS (collectively Reiger and CCS are the "CCS Defendants"). (D.I. 174 ¶ 8; D.I. 241 at 5).

### A.     The CMS Defendants

Plaintiff alleges that on May 18, 2010, he received hydrocele surgery to treat a fluid build-up around his testicles. (D.I. 174 ¶¶ 18–20). For the next eight days, Plaintiff was placed in the HYRCI infirmary, where he alleges that he slept on an unsanitary mattress, began experiencing severe post-operative complications that caused excessive pain, and had vital readings that were consistent with an infection. (*Id.* ¶¶ 22–28). Plaintiff alleges that Defendant Jones, a medical doctor, dismissed these vital readings as incorrect, blaming them on "old" and "unreliable" equipment. (*Id.* ¶ 23). Further, Plaintiff claims that Jones ignored Plaintiff's complaints about his pain and sleeping conditions, called him a "cry baby," and released him from the infirmary in a deteriorating condition. (*Id.* ¶ 29). Plaintiff states that he was then forced to sleep on a mattress on the floor of the cell next to the toilet, which exacerbated his medical complications. (*Id.* ¶ 30).

On May 27, 2010, Plaintiff was transferred to the JTVCC. (*Id.* ¶ 31). Plaintiff claims that, on his ride there, he was forced to sit on the floor of the transfer bus while handcuffed to other inmates, which aggravated the complications from his surgery. (*Id.* ¶ 32). During JTVCC's intake procedure, Plaintiff alleges that the officers conducting his strip search noticed his condition and told Defendant Davenport that Plaintiff should be housed in the infirmary and that Davenport, a nurse, should examine Plaintiff. (*Id.* ¶¶ 33–34). Plaintiff, however, claims that Davenport not

only refused to assess Plaintiff or treat his condition, but also told him that the infirmary was full. (*Id.* ¶¶ 34–36). Plaintiff alleges that the officers who conducted the strip search then called Defendant Rodgers, a doctor, to have him admitted to the infirmary, but Rodgers affirmed Davenport's decision without ever examining Plaintiff. (*Id.* ¶ 37). Plaintiff claims that he was then placed in a secure unit, where he began experiencing increased pain and worsening complications, but his complaints about his ailments went ignored. (*Id.* ¶ 38).

Plaintiff alleges that he was eventually able to see a doctor, who observed discoloration that he believed to be caused by internal bleeding, and placed Plaintiff on ten days of antibiotics and Vicodin. (*Id.* ¶¶ 40–42). That doctor also scheduled a post-operation check-up that Plaintiff claims he missed due to his transfer to the JTVCC. (*Id.* ¶¶ 42–44). Plaintiff states that when he later attended that check-up, the attending physician discovered that he was suffering from complications from his May 18, 2010 surgery that may not have developed had he attended the post-operation check-up that he was forced to miss. (*Id.* ¶ 44).

On June 24, 2010, Plaintiff underwent a corrective surgery to address those complications. (*Id.* ¶ 46). Plaintiff claims that he spent two days recovering from that surgery in the infirmary at the JTVCC before being released to his cell. (*Id.* ¶ 47). There, Plaintiff alleges that "the CMS Defendants refused to provide him with sterile bandages and saline necessary to clean and bandage his wounds." (*Id.*). The Complaint concludes its section dealing with the CMS Defendants with Plaintiff's allegation that the CMS Defendants knew that Plaintiff was suffering from severe complications following his initial surgery but intentionally delayed providing the necessary medical care to Plaintiff. (*Id.* ¶ 48).

B.     **The CCS Defendants**[2]

On July 1, 2010, as Plaintiff was recovering from his corrective surgery, CCS became the general healthcare provider for the Delaware Department of Correction. (*Id.* ¶ 49). Plaintiff claims that, around this time, he developed complications (severe pain, incontinence, infrequent and painful erections, and weight gain due to decreased testosterone levels) from his corrective surgery, but none of these maladies were addressed by CCS personnel. (*Id.* ¶ 52). Plaintiff also asserts that because CMS and CCS failed to care for his wounds after his corrective surgery and permitted him to sleep in unsanitary conditions, he developed a staph infection. (*Id.* ¶ 53).

Plaintiff claims that when he later visited a doctor on August 29, 2011, the doctor diagnosed him with lower urinary tract symptoms and a hydrocele, told Plaintiff that he needed chronic pain management, suggested that Plaintiff consider a right orchiectomy or an epididymectomy, and urged Plaintiff to get a second opinion. (*Id.* ¶ 56). But Plaintiff claims that CCS personnel refused to prescribe pain medication, failed to provide ointment for his infection, did not arrange for him to sleep in a bottom bunk, and refused to schedule an appointment for him to receive a second opinion. (*Id.* ¶¶ 57–58). On October 4, 2011, Plaintiff alleges that he developed MRSA, but CCS did not initially inform him about or treat his diagnosis. (*Id.* ¶ 59). Plaintiff claims that he continued to complain about his various ailments through December 2012, but CCS refused to examine or treat them. (*Id.* ¶ 66).

Eventually, Plaintiff was able to meet with Defendant Reiger, a doctor, in December 2012. Plaintiff states that after he told Reiger about his severe pain and how he was not receiving

---

[2]     Much of the Complaint's section dealing with the CCS Defendants contains allegations against Defendants who have since been dismissed from this action. Accordingly, the Court will not detail those allegations unless necessary to give context to the allegations against the remaining CCS Defendants.

medications, Reiger told him "that if his testicle hurt so bad, he should cut it off and that he could function with just one testicle." (*Id.* ¶ 67). Plaintiff alleges that Reiger told him that he could either have the surgery to remove his testicle or deal with the pain without any medication. (*Id.*). Ultimately, Plaintiff asserts that "Reiger did nothing to address CCS's repeated failures to treat his serious medical conditions and reaffirmed CCS's refusal to prescribe Plaintiff with the necessary pain management medication or order alternative prescriptions equal to or more helpful than the medications that CCS could no longer prescribe." (*Id.* ¶ 70).

Plaintiff claims that on March 4, 2013, he was eventually able to see another doctor, Dr. Paul, who recommended that he undergo a corrective surgery to correct nerve damage caused by the initial surgery but not fixed by the corrective surgery. (*Id.* ¶ 72). When Dr. Paul sent Plaintiff to Dr. Swier to evaluate Plaintiff for the recommended surgery, Dr. Swier administered nerve blocks to identify the nerves responsible for the pain he was experiencing. (*Id.* ¶ 73). In the summer of 2013, Plaintiff states that he received another round of nerve blocks from Dr. Swier, who echoed Dr. Paul's recommendation that Plaintiff receive surgery to correct nerve damage. (*Id.* ¶ 75). But Plaintiff alleges that despite CCS's knowledge that Plaintiff was in considerable pain and had been recommended this surgery, CCS not only never arranged for Plaintiff to receive the surgery, but also deprived him of pain medication or necessary medical care. (*Id.* ¶¶ 76–80).

II.     **LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When determining whether a genuine issue of material fact exists, this Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*,

476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party, and a factual dispute is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–49 (1986).

If the moving party makes a prima facie case that no genuine issue of material fact exists for an element, the nonmoving party bears the burden to establish the existence of each element of his case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In doing so, the non-moving party must present specific evidence from which a reasonable fact finder could conclude in his favor. *Anderson*, 477 U.S. at 248; *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). "The non-moving party . . . may not rest upon the mere allegations or denials of his pleadings" but, instead, "must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice." *D.E. v. Central Dauphin School Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014) (citations omitted). Summary judgment should be granted if no reasonable trier of fact could find for the non-moving party. *Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir. 1989).

### III. DISCUSSION

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Defendants argue that Plaintiff has both failed to produce evidence suggesting that he suffered from a serious medical need and that prison officials acted, or failed to act, in ways that

6

were deliberately indifferent to that serious medical need. Defendants also point out that Plaintiff did not present an expert opinion to support his claim, which Defendants contend is necessary. Last, Defendants CMS and CCS assert that Plaintiff failed to present evidence that either of them maintained a policy, practice, or custom that was the moving force behind the alleged constitutional harm.

### A. Serious Medical Need

"A medical need is serious . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citation and internal quotation marks omitted). Defendants submit that "there is no record evidence to support" the notion that Plaintiff suffered from a serious medical need.

The Court disagrees. Plaintiff's medical file, submitted by Defendants, shows extensive treatment and diagnoses. For example, on May 28, 2010, a CMS employee noted that a nurse was informed that Plaintiff's scrotum was large and discolored. (D.I. 242 at 58). On June 15, 2010, a CMS employee directly observed that Plaintiff's scrotum was "still very much swollen", noted penile discharge, and recommended scheduling an appointment for Plaintiff as soon as possible. (*Id.* at 55). Indeed, the bulk of the medical file submitted to the Court involves treatment by a physician and reports a condition, described above, "that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Consequently, summary judgment cannot be awarded in favor of Defendants on the basis that there is no genuine issue of material fact that Plaintiff did not suffer from a serious medical need.

### B. Deliberate Indifference

Plaintiff alleges that the Defendants were deliberately indifferent to his serious medical need. Plaintiff alleges that the CMS Defendants failed to treat his complications, delayed in getting him to a follow-up appointment, and administered insufficient treatment. (D.I. 174 ¶¶ 87–90). Plaintiff claims that the CCS Defendants denied his access to a recommended nerve surgery and delayed in providing him with necessary medical care. (*Id.* ¶¶ 96–99). Both sets of Defendants assert that there is an absence of genuinely disputed material fact on this front because they submitted evidence that they were not deliberately indifferent and Plaintiff failed to present evidence that any Defendant acted with deliberate indifference to his medical needs. (D.I. 241 at 12–17). Plaintiff disagrees, pointing not to any documents or sworn testimony, but to unsworn allegations in the Third Amended Complaint. (D.I. 244 at 5–11).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may violate the Eighth Amendment by either providing inadequate medical care with a culpable state of mind or by intentionally delaying or denying access to medical care. *See Pearson v. Prison Health Service*, 850 F.3d 526, 535–37 (3d Cir. 2017). The test for deliberate indifference is recklessness. *Farmer*, 511 U.S. at 839–40. Accordingly, allegations of medical malpractice are not sufficient to establish a Constitutional violation. *White v. Napoleon*, 897 F.2d at 108-09 (citations omitted). Moreover, "a prisoner does not have the right 'to choose a specific form of medical treatment,'" so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x. 196, 203 (3d Cir. 2010) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138–140 (2d Cir. 2000)).

In addition, when a prisoner receives medical care, there is a presumption that the treatment is proper, absent evidence that there was a violation in the standard of care. *Pearson*, 850 F.3d at 535. Thus, for a prisoner to state a colorable Eighth Amendment claim based on the receipt of inadequate medical care, he must show that the defendant acted with a culpable state of mind when providing that substandard care. *Id.* Medical expert testimony may be necessary to make out such a claim when the jury, being comprised of laymen, "would not be in a position to determine that the particular treatment or diagnosis fell below a professional standard of care." *Id.* Doing so is often necessary to defeat the presumption that the medical care provided is adequate. On the other hand, because claims based on denied or delayed medical care do not involve any treatment rendered, extrinsic proof is not necessary for the jury to find deliberate indifference. *Id.* All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors. *Id.* (citing *Durmer v. O'Carroll*, 991 F.2d 64, 68–69 (3d Cir. 1993)).

Finally, when a plaintiff attempts to hold a state actor liable under § 1983, he must allege a policy, practice, or custom that demonstrates deliberate indifference. *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992). Therefore, to establish that CMS and/or CCS are directly liable for the alleged constitutional violations, Plaintiff "must provide evidence that there was a relevant [CMS or CCS] policy or custom, and that the policy caused the constitutional violation [Plaintiff] allege[s]." *Natale v. Camden Cty. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories). Assuming the acts of Defendants' employees have violated a person's constitutional

9

rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee works, thereby rendering the entity liable under § 1983, where the inadequacy of existing practice is so likely to result in the violation of constitutional rights that the policymaker can reasonably be said to have been deliberately indifferent to the need. *See Natale*, 318 F.3d at 584 (citations omitted). "'Policy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.'" *Miller v. Corr. Med. Sys., Inc.*, 802 F. Supp. at 1132 (alteration in original) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citing *Andrews*, 895 F.2d at 1480; *Fletcher v. O'Donnell*, 867 F.2d 791, 793–94 (3d Cir. 1989)).

        1)       <u>Defendants' Evidence</u>

Both the CMS and CCS Defendants contend that they provided a constitutionally adequate course of treatment to Plaintiff.

Evidence in the record shows that in the week following Plaintiff's initial surgery, the CMS Defendants monitored Plaintiff's vital signs, incision site, and responded to pain and swelling with medication and treatment. (D.I. 242 at 42–51). When Plaintiff was discharged from the infirmary, CMS Defendants reported him as being in stable condition, prescribed him medications, and scheduled a follow-up appointment. (*Id.* at 41). In deciding where to place Plaintiff within the JTVCC, the record shows that CMS personnel consulted with Defendant Rodgers to make a medically informed decision to house Plaintiff in a bottom bunk with an abdominal belt. (*Id.* at 58). Defendants cite to evidence in the record showing that Plaintiff then reported a decreased pain level and increased ability to ambulate. (*Id.* at 53). Defendants also note that after it was

10

discovered that Plaintiff had missed his follow-up appointment, CMS personnel promptly arranged to have him scheduled for a new appointment. (*Id.* at 4). When a doctor discovered that Plaintiff needed a repeat hydrocelectomy, Defendant Rodgers approved a request for Plaintiff to get that surgery the very same week. (*Id.* at 6). Citing to the medical file, Defendants contend that they properly monitored and cared for Plaintiff following the corrective surgery, and once again made a medically informed opinion on where Plaintiff should be housed following the surgery. (*Id.* at 7, 37–40).

The CCS Defendants did not submit relevant medical files about their care of Plaintiff, and instead rest their motion on the notion that Plaintiff cannot produce admissible evidence to support his claim against them. *See* FED. R. CIV. P. 56(c)(1)(B) (permitting a party to assert that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the fact."). They contend that "Averill has [] failed to set forth any credible evidence that the CCS Defendants acted with deliberate indifference to his medical needs." (D.I. 241 at 16). Not only do the CCS Defendants claim that nothing in the record evidence supports Plaintiff's assertion that they exhibited deliberate indifference to his serious medical need, the CCS Defendants assert that they did not act with deliberate indifference toward Plaintiff.

Both the CMS and CCS Defendants also submitted an expert report prepared by Dr. David M. Albala, a physician who has practiced urology for thirty-one years. (D.I. 239, Exhibit 1). Dr. Albala's report opined that "the medical staff at both HRYCI and JVTCC treated the patient in a timely, professional manner." (*Id.* at 4). Dr. Albala explained that the operation was performed in a proper fashion and that the complications Plaintiff experienced are common to the procedure. (*Id.*). Dr. Albala contends that those complications were addressed in an appropriate and competent manner by the Defendants. (*Id.*).

11

Defendants have submitted competent evidence showing a campaign of care, treatment, and diagnoses. Moreover, Defendants have provided an expert's attestation that these efforts met the standard of care and that no party was even negligent, let alone deliberately indifferent. The evidence proffered by the CMS Defendants satisfies the Court that the CMS Defendants have made a prima facie case that they were not deliberately indifferent to Plaintiff's serious medical needs. The Court is similarly satisfied that the CCS Defendants, by detailing a sparse record and submitting an expert report who attested to the level of care provided by them, have made a prima facie case that they did not violate Plaintiff's constitutional rights.

> 2) Plaintiff's Failure to Cite Evidence That Would Create A Genuine Issue Of Material Fact

Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure demands that a party asserting that a genuine issue of material fact exists "support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." The rule omits pleadings as competent evidence for opposing a motion for summary judgment and it is clear that a litigant may not rely on its unsworn pleadings. *See First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968) ("What Rule 56(e) does make clear is that a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him."); *D.E. v. Central Dauphin School Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014) ("The non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations of his pleadings.") (citations omitted); *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000) ("At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial.").

Plaintiff's motion in opposition, however, failed to cite any record evidence, and instead rested entirely on the allegations of his Third Amended Complaint. (*See* D.I. 242 at 3–18).

Accordingly, the Defendants' motion for summary judgment must be granted because the Plaintiff has failed to point to evidence that would create a genuine issue of material fact with respect to whether Plaintiff's constitutional rights were violated. Defendants have supported their position that they were not deliberately indifferent by pointing to record evidence showing treatment, diagnoses, and care, or by detailing the absence of such evidence to the Court. In addition, Defendants submitted an expert report that claims that they treated Plaintiff in a manner that did not deviate from the standard of care. Because Defendants submitted evidence that would entitle them to judgment as a matter of law if uncontested at trial, Plaintiff was obligated to oppose the motion by submitting competent evidence demonstrating that there is a genuine dispute as to the material facts. 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727.2 (4th ed. 2021). Because he has failed to do so, and has instead chosen to rely on the bare assertions in his Complaint, the Court must grant Defendant's motion.[3]

Moreover, Plaintiff did not support his claim that he received inadequate medical care with an expert report or any other extrinsic evidence. The Court finds that doing so was necessary.[4] As described above, Plaintiff alleged that the CMS Defendants provided him with inadequate medical care and, in their motion, the CMS Defendants supplied evidence of the care they

---

[3] The Court notes that Plaintiff is not proceeding *pro se* and has been represented by counsel for several years.

[4] As *Pearson* makes clear, extrinsic proof is not necessary for claims where the plaintiff claims that medical treatment was delayed or denied for a non-medical reason. 850 F.3d at 537. Therefore, this deficiency in Plaintiff's proofs only affect his claim that he received inadequate medical care, and not his allegations of medical care that was either delayed or denied.

administered alongside an expert's attestation that their treatment met the professional standard of care. Because the jury, as laymen, would not be in a position to determine whether the CMS Defendants' particular treatment fell below a professional standard of care, Plaintiff was obliged to submit an expert report or other extrinsic proof supporting his positions on this point. *See Pearson*, 850 F.3d at 536. He failed to do so.

Plaintiff's proofs suffer from an additional deficiency with respect to his claims against CMS and CCS. Both entities, who were contracted by the state to provide healthcare to Delaware's inmates, are treated as state actors, and therefore, as explained above, Plaintiff had to show that policy, practice, or custom of these Defendants was the moving force behind the constitutional deprivations he suffered. Therefore, Plaintiff had to submit competent evidence of such a policy, practice, or custom, but instead rested on his Complaint's allegations as evidence. Again, a pleading's bare allegations are not evidence, and, accordingly, Plaintiff failed to rebut the prima facie case that CMS and CCS made against him that there was no such policy.

## IV.   CONCLUSION

For the above reasons, the Court will grant Defendants' motion for summary judgment. (D.I. 238). An appropriate order will be entered.